## THE ALASKA.

*(District Court, E. D. Michigan. September 29, 1890.)*

1. COLLISION—DAMAGES—RESTORING VESSEL.

The libelant in a collision suit is entitled to recover such damages as naturally follow from the negligence of the respondent, and to have his vessel restored as nearly as possible to her condition before the collision.

2. SAME—BEACHING VESSEL—EXPENSE OF REMOVAL.

Where the injured vessel was beached after the collision, and a bargain was made for a lump sum to take her off and carry her to a port of safety, and the sum agreed upon was actually paid, *held* that, if there was no fraud and no want of reasonable judgment in making the bargain, the amount paid was a just charge against the vessel in fault, although it was shown that the vessel might, in fact, have been gotten off for a much less sum. *Held, also,* that the owner of the injured vessel was entitled to his expenses for coming to look after the wreck.

3. SAME—COST OF SURVEY.

The practice is also to allow the cost of the survey as one of the incidental expenses of the collision.

4. SAME—COST OF REPAIRS.

The cost of repairs was also allowed, although it exceeded largely the estimated cost, and made the vessel a better and a stronger one than she was before.

5. SAME—SALVAGE AND REPAIRS—INTEREST.

Interest upon bills incurred for salvage and repairs is a matter of discretion, and in view of the fact that the vessel was made more valuable by the repairs than she was before the collision, and of some doubt as to whether the entire bill ought to be charged against the respondent, it was *held* that interest should be refused.

6. SAME—EXPENSE OF CONVOY.

The expenses of a convoy to an injured vessel should not be allowed unless the necessity for such convoy be clearly shown.

*(Syllabus by the Court.)*

In Admiralty. On exceptions to commissioner's report.

This was a libel for collision between the steam-barge Oregon and the steamer Alaska, which occurred on Saturday, November 27, 1886, at a point about six miles below Amherstburg, and near the mouth of the Detroit river. The case was suffered to go by default at the hearing, when a decree was entered for the libelant, with the usual order of reference to a commissioner to assess and report the damages.

After the collision the Oregon steamed to Amherstburg in about 55 minutes, and from there was taken across the river, and beached on Bois Blanc island. On Monday she was raised and towed to Detroit. On Tuesday she was placed in the Detroit dry-dock, and temporarily repaired, and on Wednesday she was started for Buffalo; and, after being held at Amherstburg for 12 hours, by reason of an accident to her convoy, arrived at Buffalo on the morning of December 3d, and was moored at Mills & Co.'s dry-dock. On the 8th of December, and while lying in the river at Buffalo, she was inspected and surveyed by three persons, one of whom, Mr. Humble, was chosen by the owners; another, Mr. Parsons, by the underwriters, and the third was Gilchrist, one of the owners. This survey was made about two months before she was placed in dry-dock for repairs. In the mean time, work was being done upon her by her owners.

Prior to her leaving Detroit the owners of the Alaska employed three persons to make a survey of the damages to the Oregon while she was in dry-dock here.

*F. H. Canfield*, for libelants.
*S. S. Babcock*, for claimants.

BROWN, J., (*after stating the facts as above.*) Upon filing the commissioner's report claimant excepted to the allowance of the following items:

1. To the bill of A. N. Moffat for raising the Oregon after the accident and taking her to Detroit, $750. The testimony shows that a bargain was made with Moffat for a lump sum, and that the bill was actually paid. This makes a *prima facie* case, and renders it incumbent upon the claimant to show either that the money was not paid, which is not attempted, or that there was fraud in the transaction, or that the bargain was not made in the exercise of reasonable judgment. It appears that late upon Saturday evening Gilchrist, one of the owners, came from Vermilion, Ohio, to Detroit, bringing Schuck, one of the other owners, with him. Maytham, another owner, arrived here from Buffalo Sunday morning, the 28th of November, and brought Humble, the foreman of the dry-dock company in Buffalo, at which the work was done upon her, with him. Gilchrist swears that the next day after the collision—viz., Sunday morning—he saw the Oregon sunk at Bois Blanc island, across the river from Malden. Her nose was drawn upon the bank, but her stern was sunk in deep water. He looked her over, and let the job of raising her to Moffat, at $750; but, before making such contract, he consulted Mr. Murphy, and other Canadian tug-owners. Moffat took his tug and pump and wrecking outfit with him, and went immediately to work pumping her out. They continued pumping until about 12 or 1 o'clock at night, when they stopped, because Moffat thought one pump would not do it, and the Oregon was allowed to refill. Another pump was brought down, but it did not arrive at the scene of operations until after the vessel was afloat. It seems they went to work again in the morning, and got the vessel off about noon, with the pump they had used the day before. Mr. Ashley, one of the owners of the Alaska, swears that he could have got a tug and pump for $150 a day; and, after he learned of the agreement with Moffat, he told Gilchrist he would not ratify it.

There is no doubt that this contract resulted very favorably to Moffat, and that the amount he received was a large compensation for the service actually rendered; but, when a vessel is in a situation in which the Alaska found herself, prompt action is necessary, and much must be left to the discretion and good judgment of those in charge of her. They would have been at liberty to make a contract by the day, which would probably have resulted more favorably to them, or take their chances under a contract for a lump sum. There is no evidence that Mr. Ashley actually offered to do the job himself, although, after the contract was made, he told Mr. Gilchrist that he could have found tugs and pumps at $150 a day; but, even if this offer had been made immediately after the accident, as the vessel then was, it was impossible to say how long the tug would have been engaged in getting her off, or whether she was competent for that purpose. If a bargain had been made for a *per diem*

compensation, it would have been for the interests of the tug to have prolonged the job as much as possible; if made for a lump sum, to do it in the shortest possible time. We are bound to consider, in this connection, that it was as much for the interests of the owners of the Oregon as for the owners of the Alaska that the job should be done as cheaply and expeditiously as possible. The underwriters were also interested in the same direction, and no objection was ever made by them to the payment of this bill. The ordinary rule is that, where a vessel stands in need of salvage services, a contract made by a master for a lump sum will be upheld, unless a clear advantage was taken of his necessities, and the contract was an oppressive one under the circumstances as they existed at the time it was made. I know of no reason why the same rule should not apply in a case of this kind. I see no reason to doubt the good faith of Gilchrist in making this bargain; and, while it undoubtedly resulted unfortunately for him, and incidentally for the owners of the Alaska, it might have resulted equally unfortunately for Moffat, if there had been a sudden change in the weather, or a failure of the pumps to do their work as well as expected, or more serious injuries to the Alaska than there appeared to be at the time. Upon the whole, I am unable to say that there was any want of good judgment in making this bargain. The exception must, therefore, be overruled.

2. To Maytham's bill for services and expenses, in coming from Buffalo to Detroit to look after his property, $25. His original bill was for $50. Under the circumstances, I think he should be allowed his expenses, but as he was one of the owners, I see no reason for his being allowed a compensation for his services. His expenses for five days, including his fare to and from Detroit, could hardly have been less than $25, and, under the circumstances, I see no reason for disturbing the allowance of the commissioner. In *Hobson* v. *Lord*, 92 U. S. 398, 412, it is said that when the owner of a ship sends an agent to a foreign port, into which the ship has put in distress, to advise and assist the master for the benefit of the ship and cargo, the usage of the port of New York is that the amount paid for the services of such agent, and his board and traveling and incidental expenses, are allowed in general average. See, also, *The Cayuga*, 2 Ben. 125; *The Sunnyside*, Brown, Adm. 415. This exception is also overruled.

3. To the allowance of Humble and Parsons' bill for making survey, $50. Surveys of this kind are almost always made when a vessel has received serious damage, and are often quite necessary in determining whether the vessel should be repaired or not, and are often important in reference to questions of insurance. The practice has been to allow them; and I see no objection to treating this as one of the incidental expenses of the collision. See *Sawyer* v. *Oakman*, 7 Blatchf. 290, 306.

4. To the allowance of Mills & Co.'s bill for repairs, $9,674.30. While the Oregon was lying in in dry-dock at Detroit, Mr. Ashley, one of the owners of the Alaska, employed three men to make a survey of the damage and probable cost of repairing the vessel, and putting her in as good condition as before the collision. Capt. Jones, a ship-builder

of this city, says the repairs could be done for $3,524, but he says there were different methods and different opinions. On being shown Mills & Co.'s bill, the total amount of which was $10,624.49, and asked to pick out the items which were not necessary, he says: "It is very difficult to do so. You can fix a vessel in a good many different ways." He testifies that Mills & Co. are men of good reputation; that the men who made the survey in Buffalo are competent and fair. George Irving, also a ship-builder, went through the vessel alone, and estimated the costs of repairs at $3,315, and says that the repairs that he intended to make would have made the vessel stronger. John Doran, the other surveyor, testifies that he thinks the repairs put upon the steamer would have made her a stronger boat than she was before. His estimate of the cost of such repairs was $3,740. He says his estimate included steel arches to make her as good as she was before, to stiffen her, and make her strong; that competent men might differ as to how the Oregon ought to be repaired; and the iron plates under the keelsons were necessary to remedy the injury from hogging.

Upon the other hand, a survey of the vessel was held at Buffalo by two men, one of whom represented the owners, and the other an insurance company, and, in their opinion, the cost of making such repairs would be $8,240. Without intending, in any way, to impeach the good faith of those who examined the Oregon in Detroit, I am unable to shut my eyes to the fact that persons employed for the purpose of making estimates of damages, or of value, are largely, though perhaps unconsciously, influenced by the wishes of those who employ them, and I feel quite safe in saying that I do not think that any one of these parties would have entered into a contract to make these repairs for the sums named by them. There was a strike among the ship carpenters, at the time, in Detroit, and no work was being done here, and I have no doubt their estimates of damage were controlled, to a certain extent, by the sympathy they naturally felt towards the owners of the Alaska. In addition to that, it is a matter of common experience that the estimates for repairing old houses and old vessels are usually much less than the actual cost of such repairs when made. There is no reason to suppose that the men who made the survey in Buffalo are not fully as competent as those who estimated the damage here, and the fact that their estimate was not very largely exceeded by the actual cost of the repairs, as found by the commissioner, indicates to my mind that it was far the more trustworthy of the two. While I have no doubt that these repairs did make the vessel a better and stronger one than she was before, it is well settled that this cannot be taken advantage of by those who are responsible for the injury. *The Santee,* 6 Blatchf. 1; *The Baltimore,* 8 Wall. 386; *The Catharine,* 17 How. 170; *The Fannie Tuthill,* 17 Fed. Rep. 89. The testimony on behalf of the libelants, as to repairs, includes that of Maytham, one of the owners who ordered the repairs and paid for them; of John Humble, superintendent of Mills & Co.'s yard, who personally supervised the repairs, examined the bill, and swears that the prices charged are the regular rates; of Thomas Walsh, a clerk who kept the time and account

relating to the repairs, and who swears that he opened two accounts with the vessel for the different kinds of work as though there were two vessels, one account for the injury by the collision, and the other for the new work, and that the time spent on each was kept distinct from the other; of Albert Brinkman, foreman, who swears that the repairs and new work were done separately, and separate accounts were kept with each job; that he kept track of every piece of material that went into the boat, and rendered his account to Walsh, the clerk; of Hamilton J. Mills, who swears to the correctness of the bill, and that it has been paid; of Townsend Davis, agent of the insurance companies, who testifies that the insurers paid the loss on the basis of the adjustment including the bills for repairs; and, in fact, of almost every one who would be presumed to have knowledge of the correctness of this bill.

There is really nothing to impeach their testimony, and none of the items of the bill are specifically pointed out as unnecessary to put the vessel in as good condition as she was before. While there may be a suspicion that advantage was taken of this disaster to charge upon the claimants a portion of the betterments, they have not succeeded in establishing, by any preponderance of testimony, that these repairs were not made necessary by the collision. Upon the whole, I see no ground for disturbing the report of the commissioner upon this item, and the exception is therefore overruled.

5. To the allowance of interest upon the cost of the repairs, $1,817.02. The usual practice has been to allow interest upon the cost of repairs, but, after all, the allowance of interest in actions of tort is a matter not of right, but of discretion. In common-law cases it is said that, in actions for unliquidated damages, interest is not recoverable *eo nomine*, but that the jury, in their discretion, may add interest; that, as the law does not inquire into the particulars of the verdict for damages, in some cases interest furnishes a just and convenient measure for the jury. In the same way interest may be taken into account by the jury in assessing damages in trespass and trover, but in the case of *The Independence*, (*Hemmenway* v. *Fisher*,) 20 How. 255, 260, where the question arose upon the allowance of interest upon a decree in admiralty, which had been affirmed by a divided court, it was said that—

"In cases of collision and salvage  *  *  *  it is impossible to fix the sum that ought to be awarded with absolute certainty by any rule of calculation. It will sometimes happen in an admiralty case that this court will think that the damages estimated and allowed in the circuit court are too high, and yet the opinion here may approximate so nearly to that of the court below that this court would not feel justified in reversing its judgment.  *  *  *  No rule, therefore, fixing any certain rate of interest upon decrees in admiralty, whenever the decree is affirmed, could be adopted with justice to the parties. And a discretionary power is reserved, to add, to the damages awarded by the court below, further damages by way of interest in cases where, in the opinion of this court, the appellee upon the proofs is justly entitled to such additional damages. But this allowance of interest is not an incident to the affirmance affixed to it by law or by a rule of court. If given by this court, it must be in the exercise of its discretionary power, and *pro tanto* is a new judgment."

This case was affirmed in *The Ann Caroline*, 2 Wall. 538, and in *The Scotland*, (*Dyer* v. *Navigation Co.*,) 118 U. S. 507, 6 Sup. Ct. Rep. 1174. In the case of *Redfield* v. *Iron Co.*, 110 U. S. 174, 3 Sup. Ct. Rep. 570, which was an action to recover back duties illegally exacted, it was said that if the plaintiff had been guilty of laches in unreasonably delaying the prosecution of his claim, interest may be properly withheld. When it is given as damages, it is often matter of discretion. Upon appeals to the supreme court, interest is not allowed, unless specially directed. Rule 23.

Under the circumstances of this case, in view of the undoubted and material betterment of this vessel by the repairs, and of the underlying doubt in my mind as to whether this entire bill ought to be charged to the claimants, I think it my duty to refuse the allowance of interest, and claimant's exception to this item of $1,807.02 is therefore sustained.

These are all the items of the commissioner's report to which exceptions were taken by the claimants. Although upon the argument and in the brief several others are mentioned, I do not feel at liberty to consider them in the absence of formal exceptions upon the record.

I will now proceed to consider the exceptions of the libelant.

1. To the disallowance by the commissioner of the item for towing the Oregon to Buffalo by the propeller Newburgh, $500. I am disposed, with some doubt, to concur with the report of the commissioner upon this point. Owing to the strike in Detroit, it was found necessary to take the Oregon to Buffalo, and the Newburgh was taken along as a convoy. It is said that she was employed to tow the Oregon, but the evidence is that the Oregon employed her own motive power, and was not, in fact, aided by the Newburgh. While it may have been a prudent precaution to take the Newburgh along, it was adding a large item to the already large bill for injuries, and it does not seem to me to constitute such a case of necessity as to entitle libelants to recover it from the Alaska.

2. To the deduction from Mills & Co.'s bill for repairs of certain items, amounting to $930.28. As the commissioner weighed all the testimony upon this point, and his conclusions upon such testimony are not directly attacked, I am not disposed to disturb his allowance.

With the exception of the allowance of interest, therefore, the report of the commissioner is affirmed.