## THE NORTH STAR.

*(District Court, E. D. Michigan. December 8, 1890.)*

1. COLLISION—DAMAGES—PROFITS.
   Where a steamer, which was under charter to carry 25,000 tons of iron ore, was sunk in a collision after she had entered upon the performance of such charter, and her owner was paid $2,000 for a reassignment and release of his interest in the same, upon the theory that he had the right to substitute another vessel, *held,* that, as against the vessel in fault, he could not recover the profits he would probably have realized by the full performance of the charter.

2. SAME—TOTAL LOSS—MEASURE OF DAMAGES.
   It seems that the damages recoverable by the owner of a vessel totally lost in a collision are limited to the value of the vessel and interest and the net profits of the particular voyage, and that he is not entitled to the probable profits of a charter unperformed.

3. SAME—INTEREST ON VESSEL'S VALUE.
   While interest upon the value of the vessel is a matter of discretion, it will be allowed where the faults of the two vessels are not greatly disproportional, and there is reason to believe that the witnesses have not given a true account of the circumstances attending the collision.

4. SAME—EXPENSE OF REPAIR—EVIDENCE.
   Where a witness swore that the expenses of his steamer while undergoing repairs were a certain sum, and the opposing counsel did not cross-examine as to the claims of such expenses, and there was nothing to throw suspicion upon the charge, *held,* that there was no reason for disallowing any portion of such account.

*(Syllabus by the Court.)*

In Admiralty. On exceptions to commissioner's report. See 43 Fed. Rep. 807.

This was a suit for a collision between the propeller C. J. Sheffield and the steam-ship North Star, which was tried in February, 1890, before the district judge and nautical assessors, and resulted in a decree adjudging both vessels to be in fault, apportioning the damages, and referring the case to a commissioner to compute and report the same. Upon filing such report, exception was taken by the libelants to the refusal of the commissioner to allow the sum of $14,000 for an alleged loss of profits upon a charter to carry 25,000 tons of iron ore from Two Harbors, Minn., to South Chicago, Ill., during the season of 1889. The commissioner reported that three cargoes, amounting to about 5,832 gross tons, had been transported, and the Sheffield was on a voyage for the fourth cargo at the time of the accident. It was also shown that, under ordinarily favorable circumstances, she would have completed her contract by about the 5th of September, and that the net profits which would have accrued to the libelants, if the contract had been completed, basing the computation on the net profits of the cargo already transported, would have been $16,000. From this sum the libelants deducted $2,000, the amount which they realized from the sale or reassignment to the Northwestern Transportation Company of the residue of this contract, leaving as the amount which they claimed for the loss of the charter the sum of $14,000. The alleged charter of the Sheffield was contained in certain letters between officers of the Northwestern Transportation Company and the managing owner of the steam-ship C. J. Sheffield, copies of which are contained in the commissioner's report. In relation to this the commissioner, Mr. D. J. Davison, found as follows:

"Conceding that this tripartite correspondence amounts to a charter-party which bound the steamer C. J. Sheffield to the carriage, at the specified rate, of 25,000 tons of iron ore from and to the points indicated, is this loss an element to be considered in computing the libelant's damages?

"Both in this country, and in England, in cases of partial loss, where the libelant's vessel has sustained such injuries as to interrupt her voyage, or voyages, and require her to be laid up while the damage is being made good, the net profits the vessel would or might have earned during the period of delay are allowed as an element of damages; and the net earnings of the vessel, at the time of and just prior to the accident, are deemed a just measure of such damage.

"And so, also, where the vessel is under charter for the pending voyage, the profits which would have been realized therefrom, if the voyage had been successfully completed, are allowed as an item of damage. The ground upon which these allowances are made is that the owner of the injured vessel is deprived of her use during the period required for repairs. He has neither his ship nor her value; he cannot, therefore, supply the place of the damaged vessel by the purchase of another, but he must await her restoration before he can, in any manner, derive profit from this investment of his capital. It is not the value of the unexpired term of the charter as a distinct and separate item of damage that is awarded; but the profits that would have accrued under the charter are regarded as the most equitable measure of the demurrage value of the vessel for the period of delay requisite for the repairs.

"The cases in which the question of demurrage has arisen have been generally those where there was a charter or a contract for a single specific voyage; and the allowance of the net freight upon the pending voyage proceeds

on the theory that the vessel, at the time of the accident, has been fitted out, manned, and provisioned and equipped for the contemplated voyage. The expenditures in that regard have been already made, and the amount has become a fixed and definite sum. Her freight has been delivered on board, and its amount determined; and, in most cases, the voyage has been in part accomplished. The only element of uncertainty is as to whether she will safely complete her voyage. That she will do so is deemed as certain as is the success of most business ventures. In cases of a contract for the season, requiring many successive voyages for its performance, there are involved many and greater uncertainties. Freights and wages may so fluctuate as to render the contract not only valueless, but a source of actual loss to the vessel owner.

"In cases of total loss, the full marked or cash value of the vessel, at the time of the accident, is awarded to the owner, thus making, in this respect, the most complete restitution possible in the nature of the case; and which theoretically, at least, restores to him at once his lost vessel. With the money so received, being the full market value of his vessel, he may at once purchase another, put her in commission, and immediately make her a source of profit. If the vessel was under charter for the season at the time of loss, as is claimed in this case, and there is awarded to the owner, as part of the damages resulting from the tort, the value of the unexpired term of the charter, he would then be enabled to duplicate his earnings for the balance of the season, and thus make a profit of his loss.

"It is true, if the owner is unable to secure for his substituted vessel an equally profitable charter or employment, then, in order to make good his loss, he should receive, in addition to the value of his vessel, the amount of this diminution of profits, whatever they could be shown to be. But, in the judgment of the commissioner, this inquiry would involve the consideration of matters too remote and speculative to afford any satisfactory result.

"The ordinary and most equitable rule of compensation in cases of total loss by collision is the full market value of the vessel at the time of the accident, together with her freight upon the pending voyage, with interest from the time of its estimated termination.

"This rule, while it may not in all cases afford complete relief, is reasonably certain in its application, and is the rule, as the commissioner understands, generally adopted by the courts in awarding damages in cases of total loss. Only one or two cases of departure from it are found, notably *The Freddie L. Porter*, 8 Fed. Rep. 170, in which the court assessed the net freight for the unexpired term of the charter, which was for the season. But, in the opinion of the commissioner, the contract in this case was not such a specific charter of the Sheffield as precluded her owners from substituting another vessel, and thus completing her contract. It was evidently not so considered and treated by the parties, as is evidenced by the fact of payment by the Northwestern Transportation Company to the owners of the Sheffield of the sum of $2,000 for a reassignment to it of this contract. If there was no privilege of substitution, then all the rights of the libelants under this contract to complete the transportation of the 25,000 tons of ore were extinguished by the disappearance of the Sheffield under the waters of Lake Superior, leaving nothing to assign. The only restriction as to vessels, contained in the original agreement between the Interocean Transportation Company and the Northwestern Transportation Company for the transportation of 60,000 tons of ore, of which the 25,000 were a part, is that the ore shall be carried by steamers 'without consorts.' The Interocean Transportation Company were therefore bound to furnish a cargo of ore to any suitable steamer presented by the owners of the Sheffield, provided she came without a consort, until the transportation of the 25,000 tons was completed.

"In any view of the case, the item of damages claimed for loss of profits on the charter should be, in the judgment of the commissioner, disallowed."

The claimants also filed the following exceptions to this report:

(1) To the allowance of interest upon the value of the Sheffield.

(2) In refusing to allow claimants' item of $720.66, expenses of the vessel while undergoing repairs.

*H. D. Goulder* and *H. H. Swan*, for libelants.

*C. E. Kramer* and *Robert Rae*, for claimants.

BROWN, J., (*after stating the facts as above.*) The main exception here relates to the disallowance by the commissioner of the loss of profits upon the charter of the Sheffield to carry 25,000 tons of iron ore. The facts connected with this claim are briefly as follows: On the 28th of March, the Northwestern Transportation Company, by H. H. Brown, vice-president, agreed with the Interocean Transportation Company to carry for it 60,000 tons of ore from Two Harbors to Chicago, at $1.20 per gross ton. On the 1st of April, E. M. Peck, president of the Northwestern Transportation Company, wrote to Brown, as managing owner of the Sheffield, (who, as vice-president of the Northwestern Transportation Company, had signed the contract with the Interocean Company,) notifying him of the charter, and saying that the steamer Sheffield should carry 20,000 (afterwards raised to 25,000) tons of the above amount. This was agreed to by Brown.

This is all of the so-called charter, for the loss of which this large amount of damages is claimed. Now, while this contract may undoubtedly be construed as a binding contract on the part of the Sheffield, and the Sheffield alone, to carry this amount, it was construed by the parties themselves as a contract between the Northwestern Transportation Company and Brown to carry that amount in any steamer he might designate, since, after the loss of the Sheffield, the Northwestern Transportation Company paid to Brown $2,000 for a reassignment or release of this contract. This could only be done upon the theory that Brown had the right to substitute another steamer in place of the Sheffield. By receiving the money, Brown acquiesced in this construction of the charter, and is not at liberty now, as against the North Star, to make a claim based upon a totally different construction.

Whether a libelant in any case of total loss is entitled to recover the profits of an unexpired charter, I do not find it necessary to express a decided opinion. It has been generally supposed that he was limited to a recovery of the net freight upon the particular voyage, and that interest upon the value of his vessel from that time was allowed in lieu of all other damages; and, with a single exception, the authorities seem to favor that contention. *The Columbus*, 3 W. Rob. 164; *The Amiable Nancy*, 3 Wheat. 546. The case of *The Freddie L. Porter*, 5 Fed. Rep. 822, 8 Fed. Rep. 170, is certainly authority for a broader claim. It ought to be said, however, in explanation of this case, that the opinion of the district judge is founded upon authorities holding that the owner of an injured vessel is entitled to ⸱ net freight for the particular voy-

age, and, in cases of partial loss, to an allowance in the nature of demurrage while undergoing repairs. The circuit judge affirms his opinion in a very brief opinion, and couples with it the admission that his decision may be an advance upon any which has been made. It is certainly difficult to reconcile this case with that of *The Amiable Nancy*, 3 Wheat. 546, in which the probable profits of a voyage yet *in fieri* were disallowed, and which has heretofore been accepted as settling the law for this country. There are reasons for allowing the loss of a profitable charter in a case of damage, while the vessel is undergoing repairs, which do not apply to a case of total loss. The time during which the vessel is being repaired is comparatively a short one, and the profits of the charter are adopted simply as a measure of estimating the demurrage; while, in the case of a total loss, the vessel may be under a charter which has one of some years to run, and, if the owner is entitled to recover the profits of such charter at all, there would seem to be no limit to such right, so far as respects the time of its continuance. I am not satisfied that there is anything in this case to take it out of the scope of the decision in *The Amiable Nancy*.

2. With reference to the allowance of the item of $12,000 interest upon the value of the Sheffield, (which the commissioner puts at $160,-000,) I have felt more doubt. The Sheffield was guilty of so many faults in connection with this catastrophe that I have been strongly disposed to reject this item of interest, as its allowance is a matter of discretion; but upon reflection, I am satisfied that with regard to the main fault, viz., the failure to stop and reverse, a fault but for which the collision would not have occurred, the steamers were equally to blame. In addition to this, there was a frankness upon the part of the Sheffield's officers and crew in admitting their faults, which, while it does not disarm criticism with respect to their conduct, inclines one to take as favorable a view of their case as the facts will warrant. Upon the other hand, there was such a marked discrepancy between the testimony of the men upon the Star, and the statements made by them in their protest, and even in their answer, and such obvious improbabilities upon the face of their testimony, that there is raised in my mind something more than a suspicion that their intention was to make the testimony so far as possible fit the exigencies of their case, as they had been developed by the libelant's evidence, a practice very common in collision cases, and one which the English rule, with regard to the filing of preliminary acts, was intended to provide against. Upon the whole, I have concluded not to disturb the report of the commissioner upon this point.

3. The only other item with regard to which a contest is made relates to the expenses of the North Star while undergoing repairs at Buffalo and Cleveland, which were claimed at $720.66, and allowed at $358.75; apparently upon the ground that the testimony did not satisfy the commissioner that such expenses had been incurred. It is true that the testimony with regard to these expenses is not very satisfactory; but so far as it goes, and taking it at its face value, I see no reason to doubt that they were actually incurred while the vessel was undergoing repairs,

and were consequently a proper charge against the Sheffield. With regard to this, the witness Meadowcroft was asked the following question:

"What were the actual expenses and outlay paid by your company in repairing the damage done to the North Star in this collision, and in consequence of your boat being so injured? Please give everything in the way of damage aside from demurrage."

In answer to this, the witness gives the items of the damage, the last one of which is as follows:

"Expenses of vessel while undergoing repairs at Buffalo and Cleveland, made necessary by reason of collision, during the eight days which were claimed the vessel was detained, and including also the towing at Cleveland, $720.66."

On cross-examination, he testified as follows:

"In giving the expenses during the time you claim she was detained in repairing, you have included some tow bills and possibly other items of that description. Will you give the amount per day of running expenses of the ship during that time? *Answer.* $83 per day. *Question.* Have you included the fuel for running to Cleveland, and if so to what amount in dollars? *A.* The consumption of coal by which the vessel was running to Cleveland was one ton and a quarter per hour for eighteen hours at $2.50 per ton; and while in port the consumption of fuel was seven tons per day of twenty-four hours, so that the fuel in running to Cleveland was about $56, as we have charged."

This was all the testimony in relation to this item. If the running expenses of the ship were $83 a day, eight days, this would amount to $664, which, with the $56 for fuel, would make up the $720, very nearly the amount of his bill. Now, as the witness gave this as one of several items of his account, we think it was incumbent upon libelants to cross-examine him with regard to the items of such expenses, if they entertained a doubt as to the propriety of their allowance. Instead of this, the commissioner makes an allowance for seven and a half days, of $47.74, for the pay and subsistence of the officers and crew, $358.75, a sum which, in view of this testimony, seems somewhat arbitrary. If the witness had been cross-examined with regard to this account, and had been unable or unwilling to produce the items, there might be some reason for disallowing the whole amount; but, in the absence of such cross-examination or counter-showing, I see no reason why his general testimony should not be accepted as true. As the crew were detained on board for the eight days, their wages would undoubtedly be a proper charge, as well as their provisions, and the fuel and supplies of other kinds needed and used upon the vessel while in port. Upon the whole, I have concluded to sustain this exception, and allow the item at the amount claimed, $720.66.

It results that a final decree will be entered for the libelants for the sum of $84,050.64, with interest from September 21, 1890, the date of the commissioner's report.