## The Emma Kate Ross.

### The Emma Kate Ross *et al.* v. Myers Excursion & Nav. Co.

*(Circuit Court of Appeals, Third Circuit.  June 21, 1892.)*

**1. Collision—Damages for Detention.**
 An excursion steamer, colliding with a tug through the latter's fault, was so injured as to be delayed for repairs 21 days, during all but 1 of which she was under charter. Her owners hired another boat to fill her engagements during 8 of these days, at $110 per day, and during the rest of the time substituted other vessels of their own. *Held*, that the proper measure of damages for the detention during the latter period was not the value of the charters, but the cost of the substitution, and, in the absence of evidence, the cost would be presumed to be the same as in the case of the vessel hired, namely, $110 per day. 46 Fed. Rep. 872, modified.

**2. Same.**
 In the absence of any suggestion that the hired vessel was not competent for the purpose, it was immaterial that the other substituted vessels were larger than it; nor could the recovery be affected by the fact that the substituted vessels would otherwise have been idle.

Appeal from the Circuit Court of the United States for the District of New Jersey.

In Admiralty. Libel by the Myers Excursion & Navigation Company, owners of the steamer Crystal Stream, against the Emma Kate Ross, (P. Sandford Ross and another, claimants,) for damages for collision. Decree for the libelants in the district court. 41 Fed. Rep. 826. On appeal to the circuit court, this decree was affirmed, and a decree there entered for $5,801.99 and costs. See 46 Fed. Rep. 872, where a full statement of facts will be found. The circuit court found that the Emma Kate Ross was in fault; that the Crystal Stream was free from fault; that the measure of damages for her detention during repairs was the cost of a vessel hired to fill her charter engagements during a part of the time she was detained, plus the net value of her charters for the rest of the time, her place having been filled during the latter period by other boats belonging to the libelants. Claimants appeal. Modified and affirmed.

Robert D. Benedict, for appellants.

Wing, Shoudy & Putnam, (Charles C. Burlingham, of counsel,) for appellees.

Before DALLAS, BUTLER, and WALES, Judges.

BUTLER, Judge. The errors assigned may be grouped under four heads: First, the Emma Kate Ross was not in fault; second, the Crystal Stream was in fault; third, the award for repairs is excessive; fourth, the award for detention is wrong.

As respects the first, second and third, which involve matters of fact only, we agree with the circuit court, and need add nothing to what it has said on these subjects. As respects the fourth we think there is some cause for complaint. The vessel was detained 20 days,—for which she had charters. During 8 of them the libelants hired and substituted the Moran; for the remaining 12 they substituted another of their own. For the 8 days, the court awarded the cost of the Moran's hire,—$110 per day,—and for the remaining 12, the amount of the disabled vessel's charters during that period. The true measure of loss from detention under the circumstances here shown, is the cost of substitution. When furnished a suitable vessel to take the place and do the work of the other, her owners are fully compensated, in this respect. The cost of such substitute accurately measures the market value of the other's services. The value of her charters may not; other considerations enter into this. Charters are the result largely of the business established by owners, and the energy and capacity displayed in prosecuting it. For this reason one of several similar vessels, belonging to different owners, plying between the same points, may secure twice as many cargoes as another; and yet the latter would carry them as satisfactorily, and command as good charter rates when employed. The market value of her services is consequently as great as that of the other. The cost of a proper substitute is therefore the measure of loss for detention, whenever its application is practicable. If a substitute cannot be obtained (as in ordinary cases of demurrage) it is, of course, inapplicable.

In the case before us, the court applied this measure for the period

during which the Moran was substituted,—awarding simply the cost of her hire. For the remaining 12 days, however, during which the libelants' own vessel was substituted, it awarded the net amount of charters,—thus in effect allowing for the latter substitute a much higher rate of compensation then was paid for the former. This we think is wrong,—the result probably of confining the defense, below, on this branch of the case, to a denial of any loss whatever. The libelants are entitled to the cost of a proper substitute for the whole period, and no more; and there is no just reason why they should receive a higher rate for their own substituted vessel than was paid for the other. The fact that a substitute was procured for part of the time at $110 per day justifies an inference that this was the market value of the services, and that this vessel or another could have been obtained at that rate for the entire period. The Moran was chartered for 10 days, though substituted but for 8. It is of no importance that the libelant's own substituted vessel was larger. The Moran was large enough, there is no evidence, nor suggestion, that she was not fully competent for the service. Presumably the libelants substituted their own vessel because it was more advantageous to themselves than to hire another.

The libelants cite *The Cayuga*, 14 Wall. 270, and *The Favorita*, 18 Wall. 603, where the owners of injured vessels substituted others belonging to themselves, and were awarded the amount of the formers' charters. If these cases support the contention here, the libelants have done themselves injustice in not claiming this measure of compensation for the entire period of 20 days; for if it is applicable at all under the facts it is necessarily applicable to the whole period. The cases, however, do not support the position. The question was not before the court. The libelants there, as stated, substituted their own vessels throughout the period of detention. There was no hiring, or other evidence of the market value of substitutes. Under such circumstances the inference was probably justifiable that the market value of the vessels used was equal to the value of the others' charters. This seems to have been taken for granted. The subject was not considered or alluded to. The only question raised was whether the libelants were entitled to receive *any* compensation for the vessels substituted,—as they would otherwise have been idle. This question was decided against the respondents.

Notwithstanding the decision, the respondents here, again present the question, contending, for the same reason, that the libelants should receive nothing for the 12 days during which their own vessel was substituted. Whatever we might think of this question if it was open, we are bound by the decision. It is not, however, improper to say that we think the decision is right. The libelants were entitled to the market value of the services rendered by their substitutes,—regardless of the fact that they might otherwise have been idle. The vessels represented a large investment made in preparation for contingencies which might require their services. Why then should the respondents have their use without paying for it? As the court said in *The Cayuga*, 7 Blatchf. 390:

"There is neither justice nor equity in allowing a tort feasor the benefit of this outlay, gratuitously. Conceding that a just allowance for the necessary cost of another vessel, hired at a fair value, to perform the services is necessary to indemnify the libelants, there is no ground for withholding such allowance when the libelants themselves furnish the substitute."

We do not see any force in the suggestion that the decision applies to ferryboats only, and that a distinction should be drawn between such vessels and those employed on excursions and other similar services, where substitution is practicable. We are unable to see any reason for such a distinction, and no suggestion of it is found in the cases. *The City of Pekin*, 6 Marit. Law Cas., which the respondents cite, does not sustain them. The facts of that case are numerous and complicated, but the decision, so far as it relates to this subject, determines no more than that the libelant, who operates a line of steamers between Marseilles and Shanghai, in which the Sanghailan and the Melbourne were employed, the former being injured by collision at Hong Kong, where the latter (arriving directly after) was transferred to her place, and other vessels procured as substitutes for the Melbourne, was entitled to be reimbursed the cost of such substitution, instead of receiving demurrage based on an estimated value of the Sanghailan's services during the period of detention. As the Melbourne discharged all the services the Sanghailan would have performed if she had not been injured, it was held that compensation for the expenses which her owners incurred in supplying the Melbourne's place made them whole in this respect.

The decree must be modified as before indicated. The commissioner found the net amount of charters for the 12 days during which the libelants' own vessel was substituted, to be $1,776.48. The hire of a substitute for this period at the rate paid for the Moran would be $1,320. This sum deducted from the former leaves $456.48; and the award for detention must be reduced to this extent, making the whole amount allowed on that account $2,200.48. We add nothing to this sum for delay in payment. The circuit court added nothing, and under the circumstances we do not think justice requires it. The interest on bills paid for repairs must be increased—to cover the time which has elapsed since the decree of the circuit court was entered—$228. With these modifications the decree is affirmed. Costs of the appeal to this court to be taxed by the clerk and equally borne by the parties.