THE NORTII STAR.

(District Court, W. D. New York. August 22, 1905.)

1. COLLISION—DAMAGES RECOVERABLE—DEMURRAGE.
Where it is shown with reasonable certainty that a vessel injured in collision would have obtained a charter and made earnings during the time she was detained for repairs, her owner is entitled to demurrage .based on her probable net earnings, and it is immaterial that he might have substituted another vessel in her place, but did not.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, § 290.

Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

2. SAME—INTEREST.
The allowance of interest on the sum awarded as damages for collision is discretionary with the court.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, § 284.]

In Admiralty. On exceptions to commissioner's report.

Goulder, Holding & Masten and George Clinton, for libelant.

Shaw, Warren, Cady & Oakes and Joseph G. Dudley, for respondent.

HAZEL, District Judge. This action came before me upon exceptions to the commissioner's report of the amount of damages sustained by the Bessemer Steamship Company, by reason of the collision on November 28, 1899, in St. Mary's river, of its steamship Sir William Siemens and her consort, the barge Alexander Holley, with the steamboat North Star. The latter vessel, by a prior decree of this court, was alone held responsible for the disaster. The Siemens and consort were under charter to carry iron ore to Conneaut, Ohio. The contract for the year 1899 terminated on December 1st, and the interrupted trip was the last for that season under the same. The libelant excepts to the report of the commissioner on the single ground that he has rejected a claim for damages for the loss of use of the steamer and consort. The report states, among other things, that, had the collision not occurred, libelant's vessels would have arrived at their port of destination, November 30th, at about 2 o'clock p. m., and could have returned to Duluth, Minn., taken on a cargo of grain, and returned within the period of navigation fixed by the underwriters. It was conceded on the hearing that, if the voyage down had not been obstructed, libelant's vessels could have made another trip before the close of navigation on the Great Lakes, and earned 3¾ or 4 cents per bushel carrying grain from Duluth to Buffalo, N. Y.

The rule of law governing the recovery for detention and loss of use of a vessel on account of the wrongful act of another is found in The Conqueror, 166 U. S. 125, 17 Sup. Ct. 516, 41 L. Ed. 937. It is there stated:

"That the loss of profits or of the use of a vessel, pending repairs or other detention, arising from a collision or other maritime tort, and commonly spoken of as demurrage, is a proper element of damage, is too well settled both in England and America to be open to question. It is equally well set-·

tled, however, that demurrage will only be allowed when profits have actually been, or may be reasonably supposed to have been, lost, and the amount of such profits is proven with reasonable certainty."

It will be observed that damages such as are here sought are recoverable only when the loss of profits is proved with reasonable certainty. The commissioner refused to make any allowance for the loss of use during the vessels' delay, because the evidence did not show that charters were offered the libelant (also the owner of other vessels) for the specific vessels detained by the collision. The undisputed evidence, however, shows that the Siemens belonged to a class of vessels for which there was a demand, and that grain cargoes were available to vessels of her class after November 28, 1899; that libelant was offered charters from Duluth to Buffalo at the transportation rate of five cents per bushel; that two charters were accepted for certain of libelant's vessels, and additional charters refused, owing to the condition of the Siemens. The witness Shaw, cashier for libelant, though but 27 years old, had charge of this branch of the business during the illness of his superior officer. His testimony, as stated, is not rebutted, and no sufficient reason appears why it should be discredited. The object and purpose of the law is to compensate and indemnify the owner for what he has actually lost on account of the collision. Williamson v. Barrett, 13 How. 101, 14 L. Ed. 68; The Potomac, 105 U. S. 630, 26 L. Ed. 1194; The Lagonda (D. C.) 44 Fed. 367; The Margaret J. Sanford (C. C.) 37 Fed. 148. In the last-mentioned case, Judge Wallace said:

"When a vessel is employed at the time of the collision, or when it appears that she would have been beneficially employed during the period of her detention, it is entirely clear that actual loss has attended the interruption of her engagements."

See, also, The Cayuga, 2 Ben. 125, Fed. Cas. No. 2,535.

In Williamson v. Barrett, supra, the Supreme Court says:

"If there is no demand for the employment, and, of course, no hire to be obtained, no compensation for the detention during the repairs will be allowed, as no loss would be sustained. But, if it can be shown that the vessel might have been chartered during the period of the repairs, it is impossible to deny that the owner has not lost in consequence of the damage, the amount which she might have thus earned."

Such is the law applicable to this case. The facts show, not only that opportunity existed for using the Siemens and Holley to carry grain from Duluth to Buffalo, but that in all probability freight would have been earned between December 2d and the actual close of navigation, despite the early approach of the close of the season. Both vessels were prevented by the collision from making another trip during that season. The proposition that the vessels belonged to a fleet owned by libelants, and that other vessels could have been substituted, is unimportant. The reasonable supposition arising from the proofs is that the vessels in question would have been profitably employed before the final closing of navigation. If libelant had made substitution of other vessels, it nevertheless would be entitled to recover for the loss sustained in being deprived

of the use and services of the detained vessels. Hence it is difficult to conceive of any substantial reason for the disallowance of damages in a case where there has been no substitution. An owner, whose ship is admitted to be a trading vessel, is not bound legally to substitute another vessel owned by him even though such vessel would otherwise have been unemployed. The Emma Kate Ross, 50 Fed. 845, 2 C. C. A. 55; The State of California, 54 Fed. 404, 4 C. C. A. 393. The trend of authorities is to the effect that a tortfeasor must suffer whatever damages have been sustained without looking to the injured party for any assistance whatever. In the case of the Mayflower, 1 Brown, Adm. 376, Fed. Cas. No. 9,345, Judge Longyear broadly stated the rule as follows:

"I think strict justice requires that the party in fault should bear whatever inconvenience or hardship there may be arising out of the attendant difficulties and doubts. Dr. Lushington, in the case of The Gazelle, 2 W. Rob. Adm. 281, 284, in remarking upon the general question, with great clearness and justice said: 'The right against a wrongdoer is for a restitutio in integrum, and this restitution he is bound to make without calling upon the party injured to assist him in any way whatsoever.'"

This doctrine was cited with approval in The Conqueror, supra. In The State of California, supra, the Circuit Court of Appeals for the Ninth Circuit, passing upon the question of the measure of damages to a vessel injured by collision during the time of repairing, said:

"The fact that another vessel belonging to the same owner was used as a substitute for the disabled steamer during the time of her detention should not militate against the right to compensation, nor afford just cause for awarding less than would be allowed if the owner, from lack of enterprise or inability, failed to have an available substitute for use in such an emergency."

Clearly, then, in a proper case, demurrage is allowable, not because of a substitution by the owner of one vessel for another, as the commissioner seemed to think, but because of the fact that he has been deprived of the use and employment of the disabled vessel, and has, in consequence, sustained a loss by the actual detention of such vessel coming in collision with another. Therefore, upon principle, it cannot be contended successfully that, since no other vessel was engaged as a substitute for the disabled vessel, the wrongdoer should be relieved from liability or the measure of damages diminished.

The next question is the actual loss sustained by libelant. The stipulation filed in the cause indicates the amount of profits which the vessels could have earned, considering their capacity, if the disaster had not occurred. The net value of the use of the steamboat at the specified time, assuming the transportation of a cargo of grain from Duluth to Buffalo, at a rate of 3¾ cents per bushel, on an average cargo of 200,000 bushels, was $5,806.57; and the net value of the use of the tow, based on a like rate per bushel of grain, on an average cargo of 190,000 bushels, was $6,230.31. The question of interest was not passed upon by the commissioner, but by agreement was reserved for the court. The allowance of interest is discretionary. The North Star (D. C.) 44 Fed. 492; The Alaska

(D. C.) 44 Fed. 498; The Celestial Empire (D. C.) 11 Fed. 761. Although the omission to substitute available vessels for those disabled should not militate against restitution, still I am of opinion that the question of interest upon the loss of profits is fairly open to doubt, and, therefore, no interest is allowed. On other items interest may be computed from November 28, 1899, the date of the disaster.

A decree may be entered amending the report of the commissioner, and allowing the additional amount of $12,036.88 for the loss of use of the vessels in question, with costs.