## THE NORWOOD.

(District Court, W. D. Washington, S. D. July 9, 1914.)

No. 1265.

1. COLLISION (§ 71*)—MOVING AND MOORED VESSEL.

A steamer, being navigated down a river under usual and ordinary conditions, *held* in fault for a collision with a scow lying at a wharf.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 101; Dec. Dig. § 71.*]

2. COLLISION (§ 132*)—MEASURE OF DAMAGES.

Restitution is the rule of damages for collision, where the injured vessel is not a total loss and repairs are practical.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 286; Dec. Dig. § 132.*]

In Admiralty. Suit for collision by the Grays Harbor Construction Company against the steamship Norwood, Sudden & Christensen, claimants, and the Soule Tug & Barge Company, owner of the tug Hoquiam. Decree for libelant against the Norwood.

C. W. Hodgdon, of Hoquiam, Wash., and Frederick H. Murray and Charles W. Stewart, both of Tacoma, Wash., for libelant.

John C. Hogan, of Aberdeen, Wash., for respondents Sudden & Christensen and steamship Norwood.

Hudson, Holt & Harmon, of Tacoma, Wash., for respondent Soule Tug & Barge Co.

CUSHMAN, District Judge. [1] A libel was filed herein to recover damages on account of a collision between the steamship Norwood and a scow belonging to libelant. Claimant answered, denying negligence in the navigation of the Norwood, and alleging that, at the time of the collision, the Norwood was in the exclusive control, direction, and management of the tug Hoquiam and its master, which was towing the Norwood down the Hoquiam river, and averring that the collision was either the result of an inevitable accident, or due to negligence on the part of the tug and contributory negligence on the part of libelant. Thereafter, an amended libel was filed, charging the collision to have been caused through the fault of the Norwood and the tug Hoquiam.

At the point of collision the river makes an abrupt bend to the left—in going down the stream. At this point the river is about 200 feet wide. The steamer was a lumber-carrying schooner 203 feet long, with a 38.5-foot beam, drawing 19½ feet of water, laden. Her master was a man 49 years of age, who had been following the sea for 24 years—13 years as a master. The Norwood had taken a cargo of lumber about one mile above the point of collision. It was low tide on the 19th day of July, 1912, at 10:44 a. m. and high tide at 5 p. m. The Norwood engaged the services of the tug Hoquiam for the pur-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

pose of towing her down the Hoquiam river into Grays Harbor proper. The Norwood, in tow of the Hoquiam left the mill dock at 2:15 p. m., and arrived opposite the wharf of the Grays Harbor Construction Company at 3 p. m., two hours before high tide. The day was clear, and there was no obstruction of any kind to the view. It was the usual and customary stage of the tide at which the Norwood and other vessels of her type went down the river. It was customary for such vessels to leave at a stage of tide that would permit them to go over the Grays Harbor bar at high tide. One hour's time was required for the Norwood to go down the river, a distance of about a mile and a half, two hours being required to go from the mouth of the river over the Grays Harbor bar. The river shoals on the left, or inside of the bend, the deeper water being on the outside of the bend, immediately in front of or underneath the wharf of libelant, at which the scow was lying moored, awaiting repairs. This wharf was placed in the position in which it was with the approval of the government engineers. At the time of the collision, the Norwood was being handled by her own crew, the tug having preceded her down the river to assist in getting her around the bend, where the collision occurred. The Norwood struck the mud in the bottom of the river causing her to sheer to port. The master signaled the engineer full speed astern as soon as the vessel struck bottom. The starboard anchor was thrown overboard and the helm put to starboard. The propeller of the Norwood is such that she backs to port, which, with the incoming tide on the port bow of the Norwood, swung her bow to starboard, striking the libelant's scow. The tug Hoquiam cast off from the Norwood, made fast to the scow, and towed it across the river to the shallower water, where, having sprung a leak, she listed in such shape as to allow the machinery with which she was equipped, for screening sand and gravel, to slide off the scow into the water. The scow was 17 feet, 10 inches, in width, by 51 feet in length, with a depth of 4 feet, and had on her a screener, weighing several thousand pounds, set up on timbers at a height of 15 feet above the deck of the scow. There was a boiler on the scow about 11 feet high, resting on a brick foundation. Around this machinery was built a house.

It was realized by the captain of the Norwood and the captain of the tug that this was a dangerous bend in the river. The captain of the Norwood testified:

"I won't swear I didn't cut across the bend. I couldn't tell exactly the course without looking back, which I didn't do. At the time of the accident, the Hoquiam was on the port bow. I steered my boat on my own judgment."

While the captain of the Norwood was familiar with the navigation of the river, he was not accustomed to handling, in its navigation, vessels as large as the Norwood. He had only been running the Norwood a short time, and had been navigating a smaller boat theretofore. The Norwood, however, was of the average size of the lumber schooners navigating the river, and larger vessels were accustomed to navigate it past the point of collision. It was shown that no sudden shoaling in the stream at the point of grounding had occurred.

Libelant relies upon the following authorities: The Transit, Fed. Cas. No. 14,138; The Cayuga, 59 Fed. 483, 8 C. C. A. 188; Spencer on Marine Collision, p. 370, 1 et seq.; The Conqueror, 166 U. S. 125, 17 Sup. Ct. 510, 41 L. Ed. 937; Evans v. The Belgenland (D. C.) 36 Fed. 504; The North Star (D. C.) 140 Fed. 263; The Schooner Catharine v. Dickinson, 17 How. 170, 15 L. Ed. 234; Williamson v. Barrett, 13 How. 101, 14 L. Ed. 73; 7 Cyc. 391, 392, 394, 8 and 8b, 390; 10 Cent. Dig. 289. Respondents cite the following cases: Stainback v. Rae, 14 How. 532, 14 L. Ed. 530; Ralli v. Troop, 157 U. S. 406, 15 Sup. Ct. 657, 39 L. Ed. 751; The Lepanto (D. C.) 21 Fed. 651; note 45 Am. Dec. 51, 52; 7 Cyc. 314; 1 Parsons, Sh. & Adm. 541; Williamson v. Barrett, 13 How. 101, 14 L. Ed. 68; The Schooner Catharine, 17 How. 170, 15 L. Ed. 233; Smith v. Condry, 1 How. 28, 11 L. Ed. 35.

In view of the foregoing and the general rule that, where a vessel in motion comes in collision with one moored at the wharf, the presumption is that the fault was that of the vessel in motion, unless the moored vessel was where she should not have been, it is clear that the collision was the fault of the Norwood, and that no negligence is shown on the part of the construction company, either in the location of its wharf, or because of the scow's being kept moored in the position it was at the wharf, as it was of no unusual dimensions. It is also found that no negligence has been shown, contributing in any way to the injury, on the part of the tug Hoquiam.

[2] The scow was raised and repaired. The greater part of the machinery was recovered. Partly influenced by a desire to avoid delay, the machinery was installed by libelant, not upon the injured scow, but upon a new and larger one. Testimony was given to the effect that the cost was no greater for placing this machinery upon the new scow than it would have been to have replaced it on the old.

"In case of the total loss of a vessel in collision, solely through the fault of the other vessel, the measure of damages recoverable by her owner is her market value where she has such a value and it can be shown." Alaska S. S. Co. v. Inland Nav. Co., 211 Fed. 840, 128 C. C. A.

"Restitution is the rule in all cases where repairs are practical, and compensation when the loss is total." Spencer on the Law of Maritime Collisions, § 200.

"But when the injured vessel is not a total loss, and is capable of being repaired and restored to her original situation, the cost necessary to such repair cannot be said to be an incorrect rule of damages." The Granite State, 70 U. S. (3 Wall.) 310, 18 L. Ed. 179.

The testimony on behalf of libelant is very unsatisfactory as to the cost of repairing the old scow and placing the machinery on the new. The following items and amounts will be allowed:

| | |
|---|---:|
| For services of the tug Manette, in raising the scow and machinery.. | $ 50 00 |
| Like services upon the part of a dredge | 60 00 |
| For diver and tender | 60 00 |
| The bill of Endresen & Co. for repairing the old scow | 295 00 |
| The cost of removing the salved machinery from the dock and installing it on the new scow | 487 26 |
| | $952 26 |

Libelant makes certain claims for special damages, on account of the excessive cost to it of sand and gravel necessary to fill its contracts after the collision and before getting into commission the new scow, for loss of profits for the same time, and for lessened value of the scow, even after its repair. The evidence is not sufficient to support any finding of damage upon the latter item.

Owing to the uncertain and indefinite character of the evidence concerning any excessive cost of sand and gravel and as to the loss of any profits because of not being able to use the scow, coupled with the facts that the scow was, at the time of the collision, awaiting repairs; that the length of time which would have been required for that purpose is problematical; that the scow had not lately been, and was not immediately intended to be used in securing sand and gravel; that no satisfactory evidence was offered as to the value of the use of the old scow—it is considered more just and equitable to allow libelant interest, at 6 per cent., on the value of the old scow and machinery from the time of collision until the new scow was put in commission, which was 33 days. For this purpose, the value of the old scow and machinery is found to be made up as follows:

| | | |
|---|---:|---:|
| Bare scow | $650 00 | |
| Boiler | 500 00 | |
| Pump | 725 00 | |
| Engine | 90 00 | |
| Screener | 800 00 | |
| | | $2,765 00 |
| to which should be added the cost of installing the machinery | | 487 26 |
| | | $3,252 26 |

Costs will be allowed respondent Soule Tug & Barge Company, owners of the tug Hoquiam against libelant and claimant, to be equally divided, one-half against each.