## THE WALTER A. LUCKENBACH. THE LYMAN STEWART. LUCKENBACH S. S. CO. v. UNION OIL CO. OF CALIFORNIA.

(District Court, N. D. California. August 11, 1924. Amendment to Decision, Oct. 4, 1924.)

**Collision  ⊚102—Meeting steamships both held in fault for a collision in Golden Gate in a fog.**

A collision in a fog between the steamships Walter A. Luckenbach, entering the Golden Gate, and the Lyman Stewart, passing out. *held* due to faults of both vessels for proceeding at half speed, which was immoderate in the place and under the conditions, and for failure to maintain efficient lookouts; the Stewart also being in fault for being to the south of the middle of the channel.

In Admiralty. Suit for collision by the Luckenbach Steamship Company against the steamship Lyman Stewart, with cross-libel, or separate libel, by the Union Oil Company of California against the steamship Walter A. Luckenbach, consolidated with a petition by the Luckenbach Steamship Company for limitation of liability. Decree dividing damages, and petition for limitation of liability granted.

Andros & Hengstler and F. W. Dorr, all of San Francisco, Cal., for Luckenbach S. S. Co.

McCutchen, Olney, Mannon & Greene, of San Francisco, Cal., for the Lyman Stewart.

McClanahan & Derby and William Denman, all of San Francisco, Cal., for certain of the Lyman Stewart's cargo.

BOURQUIN, District Judge. The proceedings upon libelant's libel and petition for limitation of liability have been consolidated and tried. The case is one of collision between steamers, and involves the law of the road at sea, nothing mysterious and in fundamentals like to that upon land. The evidence is mainly by depositions (and in large part vilely leading), though libelant, in contrast to respondent, presents its principal witnesses to the place of the collision (the issue most strenuously contested) for oral examination at the trial.

In respect to this issue, the evidence is in direct conflict. However, so much involved are estimates, calculations, opinions based on scanty observations, that in the circumstances perhaps no witness is willfully wrong therein. At the same time it may be observed that, even as "every passenger swears by his ship," as said the Supreme Court many years ago, a fortiori ships' crews do likewise.

Libelant and respondent claiming full damages, each has a burden to prove the other's fault and its own lack of contributing fault. In the latter both have failed. The Clara, 102 U. S. 203, 26 L. Ed. 145.

To describe the ships: Libelant's Walter A. Luckenbach is a freighter, 470 feet long, of 10,500 tons capacity, turbines, and twin screws, 14 knots full speed, and 9.8 half speed; and respondent's Lyman Stewart was an oil tanker, 450 feet long, of 11,500 tons capacity, reciprocating engines, and single screw, 9 knots full speed, and 6.5 to 7 knots half speed. The Luckenbach's half speed is fixed at usual 70 per cent. of full speed, despite some claim that it was but 7.5 knots, an unexplained and unaccepted departure and wholly inconsistent with her performance.

The collision was at 3:23 p. m., October 7, 1922, somewhat westerly of a line from Lime Point on the north side of the Golden Gate to Fort Point on the south side, and somewhat southerly of mid-channel. That it was southerly, as libelant contends, rather than northerly, as respondent contends, is further supported by the probabilities, as will later appear.

At the time the sea was smooth, the tide half ebb and of 4 knots at collision to 3 knots at material distances. The Luckenbach, with less than full cargo was inbound from off the lightship, and one-fourth mile north of Mile Rock she reduced full speed to half speed upon entering heavy fog of rather continuous quality, though some witnesses characterize it as in "waves" or "bunches." Approaching the place of collision, she maintained half speed until too late to stop before arriving at the point of intersection with the Stewart, after sighting the latter in fog of not to exceed two ship lengths' visibility.

The Stewart, with one-third full cargo (as appears from answers and claims, though her master asserts she had "full cargo"), was outbound from Martinez, via Raccoon Strait, and somewhere off Point Covallo she likewise reduced full speed to half speed upon entering the fog, and she too so continued until unable to stop, even as the Luckenbach was. In consequence, the Luckenbach's bow struck and penetrated the port bow of the Stewart for 15 feet, and in some part below water line. The Luckenbach, comparatively slightly injured, in due time proceeded to port, and the Stewart, flooded forward, drifted with the tide and went ashore inside Mile Rock, practically a total loss.

Adverting· to the place of collision, to support their contention, both parties appeal to courses, distances, speed, shore lines, calculations, and estimates, etc., in great detail. Without extensive analysis herein of the evidence, with due consideration of all of it, the applicable principles and the undefinable impressions of the trial, the court finds that the collision occurred somewhat south of mid-channel. As before stated, the probabilities sustain this conclusion. The Luckenbach, from the lightship to one-four mile off Mile Rock and before obscurity by fog, could set a straight course by compass and shore objects for the Gate; whereas the Stewart was bound to pursue a curving and changing course, in part calculated and made when obscured by fog, to round Lime Point. The Luckenbach, stemming the tide, in some respects was easier to control than the Stewart, running with the tide.

The pilot of the Stewart, who was also her master, virtually admitted that he did not know the course or speed of the current at Lime Point, that he there failed to allow for the tide (setting him southerly), and that he failed to allow for the westerly deviation of his compass.· As she approached Lime Point, the Stewart was in a tide strengthened by the rivers increased by rains, and on a course crossing the channel. Necessarily to round Lime Point she made several, and her pilot says, slow ·and easy, shifts of rudder to starboard, part in the obscurity of fog, to take a course about 35° more westerly and out through the Gate and channel. Without allowances as aforesaid, and running 9 to 10 knots over the ground, in the circumstances her momentum and the tide inevitably carried her in a long fish hook curve, rather than a circular one, and she overran her pilot's intended course the small distance necessary to sweep her more or less broadside around Lime Point and south of mid-channel; and this, although her pilot's calculations and estimates from fleeting views through holes in the fog and otherwise, are that the Stewart and collision were north of mid-channel. From Lime Point the channel scales 3,750 feet to Fort' Point buoy. The Stewart's pilot estimates that at collision she was one-fourth mile, or 1,521.7 feet, from Lime Point, abeam; that is, only 353.3 feet from mid-channel. In the circumstances, his estimate could and did fall short by 353.3 feet and more, however honestly by him made. Moreover, this conclusion finds support in his mental reaction to the collision.

By wireless to the Stewart's owner he promptly reported the collision, and requested, "Send tug off Fort Point," his only description of locality or place. He admits he then had no plan, and knowing neither course nor speed of the tide, or without drift in mind, his mental processes grasped nothing but his presently discovered position "off Fort Point"; and he called for a tug there, south of mid-channel, rather than off Lime Point, north of mid-channel, and where he testified the collision took place.

The testimony of disinterested witnesses (discarding Otten's, favorable to libelant, for doubtful identification at least) is of little importance, dependent as it is upon direction and distance of sounds, and subsequent drift and other movements as consistent with one contention as the other. The same may be said of the Luckenbach's slight swing to port and recovery immediately prior to collision. That the latter's bow struck the Stewart on the port bow is accounted for by the Stewart's engines reversed, necessarily swinging her stern to port and her bow to starboard, as by tide and momentum she was carried onward to the point of intersection.

In the circumstances the Stewart was where she had no right to be, south of mid-channel, a narrow channel and inland waters, without excuse. But that is not all of the case. As before stated, both ships were proceeding at speed immoderate in circumstances of narrow channel, heavy fog, ebb tide of 3 to 4 knots, both capable of steerageway at speed of 1 to 2 knots, and entrance to a great and busy harbor. The Luckenbach at the vital time proceeded 9.8 knots through the water and 5 to 6 plus over the ground, and the Stewart likewise 9 to 10 knots over the ground and 5 to 6 plus through the water. The speed of both were proximate causes of collision.

Fixed points, times, and distances confirm this conclusion, despite characteristic disclaimers, and assertions of slow speed, stopped and reversed engines, little headway, or stopped or astern through the water. Speed with the current is more culpable than speed against it, in that the ship in the latter situation is capable of better control and quicker stop and sternway in its approach to the other ship; the vital factor being speed of approach, whether through water or over the ground, by power or mere drift. A ship adrift in the current, like an auto down grade, must apply brakes—reverse the propellers.

It is true that the Luckenbach was where

she had right to be, on the south side of mid-channel, and ordinarily was not bound to anticipate that outbound ships would be there encountered. This, however, did not excuse her speed, immoderate in fog and attendant circumstances. The inland rule against immoderate speed in fog was not abrogated because the Stewart violated the like rule requiring her to keep north of mid-channel. Both rules for safety of navigation had equal operation, and the violation of one is no less a fault than is the violation of the other.

The Luckenbach was bound to anticipate that, in the circumstances and by misadventure or otherwise, outbound ships might proceed more or less south of mid-channel, and she also was bound to proceed at moderate speed, to avoid any collision so far as moderate speed might do so. Her failure was a proximate cause of the collision that followed. The like comment applies in respect to other rules following.

Additional fault of both ships and proximate causes of the collision appear in connection with their lookouts. The Luckenbach's was 100 feet abaft the bow and 30 feet above the deck (perhaps 55 feet above the water), and the Stewart's was on the forecastle head, about 15 feet above the water. That Luckenbach's was not in the bow, and by reason of its construction could not be to the owner's knowledge, actual or presumed, is immaterial; for, since Stewart's properly placed lookout sighted the Luckenbach as early as the fog permitted, two ship's lengths away, but too late to avert collision, had the Luckenbach's lookout been as advantageously placed, the result would have been the same.

Nevertheless both lookouts negligently failed in their duty, as appears following: The Luckenbach's fog whistle was automatic and duly sounded; the Stewart's was by hand and sounded, though probably with some irregularity, by the second mate, who was contemporaneously making some log entries and telegraphing orders to the engine room. That the Stewart's whistles were repeatedly heard by the Luckenbach's lookout seems clear. But he was an inexperienced college freshman, and failed to interpret and report all the whistles. He heard what he judged to be land fog whistles, ship whistles, and "steam whistles in the harbor." Evidently he did not understand that all whistles, however distant, forward of the beam, were to be reported, and so he reported none but the Stewart's whistle, so close that the Stewart came into

view immediately, and not over two ship lengths away. The "steam whistles in the harbor" were whistles of Stewart coming through and out of the harbor, in reasonable probability; but they went unheeded by the lookout and by Luckenbach. The Stewart's lookout, in ancient and common strategy, on land as well as sea, testifies he heard no whistles, save the Luckenbach's as she came into view two ship lengths ahead and to port. If so, his failure was due to heedlessness and neglect, closing his ears. They were blown, regular, heavy, and loud, their volume augmented by the fact that the steamers were approaching at 15 to 16 knots; and they, too, were unheeded by the lookout and by Stewart. Like comment applies in respect to testimony of others on the steamers that, though listening, they did not hear the whistles. Neither ship stopped her engines so far as circumstances would permit (the Luckenbach to steerageway, at least; the Stewart to stationary over the ground) when the other's fog whistles ought to have been and were heard, viz. long before coming into view. Thereafter stoppage was of no avail.

In the matter of the Luckenbach's pilot, in so far as he is responsible for immoderate speed, he may have been neglectful, and so abused his office; but he is proven competent, as the court finds. Further, in the matter of limitation of liability, the proof unquestionably vindicates the owner of the Luckenbach and requires finding for it. The law is settled and authorities abundant that in the circumstances the collision was due to mutual fault of the two ships; and so the court finds.

Libelant's charge, that by lack of ordinary care subsequent to collision the Stewart was cast ashore, and respondent's charge, that the Luckenbach failed to stand by, appear to have been abandoned, taking briefs for it; the former for no very clear reason, in that, if the Stewart's master possessed and exercised reasonable seamanship and skill as a navigator, it is hardly manifest in this record. See The Baltimore, 8 Wall. 377, 19 L. Ed. 463.

In smooth water, one-third cargo, flooded only forward, and down by the head little more than if full cargo, a low main deck, partly awash forward, but lifted by jettison of cargo, bow, forward deck, and forecastle eight feet or more above main deck, engines in order, and men standing by to work them, anchors likewise, two vessels timely ready to give or take a line, the Stewart in a 3 or 4 knot current was per-

mitted to drift like a helpless derelict for two miles, along an eddy of safe anchorage, and to and upon known rocks, without the turn of a wheel, until too late to save her, and without letting go a single anchor. The master's excuses seem weak. He knew the tug he requested could not arrive before he would drift upon Mile Rock, or the rocks inshore; and he testifies that, instead of operating his engines, if necessary, gently and early to prevent his long decline to that fatal situation, he preferred to wait until on the point of arrival, and then by vigorous reverse and sternway to drift outside and clear, and that this was defeated by Nature's reversal of her laws of motion. The first primitive man, who bestrode a log and took to the current, knew enough to paddle timely with his hands to avoid obstructions far ahead, and drifting to shore, where some ravenous beast awaited him, knew enough to anchor, to drop his legs to bottom, before arrival at the point of danger. Likewise, a river pilot on a raft. That anchoring would have caused the current to send the vessel under is doubtful. At least, with little action of the engines, it is believed the Stewart could have angled into the eddy of South Bay and there safely anchored.

It appears likely that the services of the Luckenbach or Loop were not taken, to avoid salvage no more than pro opere et labore—unreasonable economy at least. It is true there was emergency, but none so violent, great, and imminent that should have paralyzed the intelligence of any average shipmaster.

What is seamanship and skill in navigators, but some ability to cope with emergencies? Ability to box the compass surely is not enough to qualify as a master. In the situation of the Stewart, the average landsman might not have done better; but clearly he would have done no worse. However, the evidence in, libelant with expert knowledge seems to have concluded otherwise, to agree with respondent, and hence there is no reason for the court and a judge from a mile above sea level to go counter thereto.

The conclusion is that both ships were in fault, and caused the collision and all loss that followed; that the damages will be equally divided between the libelant and respondent in amounts and payment in usual course; and that libelant is entitled to limitation of liability. The usual reference to determine claims and damages will be had. If either party desires more formal findings, it may submit them on notice.

### Amendment to Decision.

The petition of the Luckenbach Steamship Company for change in the finding of the court in the matter in said petition set out, is granted. The claim of libelant's counsel that in their briefs they indicate reliance upon the proposition that by respondent's lack of reasonable care and diligence subsequent to collision the Lyman Stewart went ashore and aggravated or incurred further damages, is supported by inspection. But argument is wholly wanting. Nevertheless the court is responsible for the righteousness of its own decisions, as more than once the Supreme Court has observed, and when fully informed cannot escape this responsibility by counsel's neglect or indifferent presentation of his client's cause.

Even on appeal, the court may and often does note errors not assigned, condone or ignore lack of any brief or argument, and decide the cause upon full examination of the merits. In the instant proceedings the court necessarily read the entire record, and was fully informed of the issues, evidence, and law, whether or not properly aided by counsel.

From the whole it appeared likely, as on further consideration it appears as a fact, that the collision affords no sufficient cause for the subsequent loss of the Lyman Stewart and her cargo; that the collision reduced the Lyman Stewart to a condition of damage, but that its navigator's subsequent negligence greatly aggravated the damages; and that the navigator of the Lyman Stewart inexcusably failed to exercise reasonable care, skill, and diligence to protect the ship from further damage, and because thereof permitted her to be cast ashore to her total loss.

As the court views it, the principle of The Clara, 102 U. S. 203, 26 L. Ed. 145, imposes upon respondent the burden to prove due care and diligence to protect the Lyman Stewart after collision and to mitigate or prevent further damages.

In any event the evidence and the indefinable impressions of the trial impel the finding as aforesaid. It is made accordingly.